# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK JACKSON, | ) |
| Plaintiffs, | ) |
| | ) No. 07-CV-0692-MJR |
| v. | ) |
| ILLINOIS DEPARTMENT OF HUMAN SERVICES, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### A. Introduction and Background

On October 12, 2007, Plaintiff Mark Jackson, a former employee at the Clyde H. Choate Mental Health and Development Center (Choate), filed this action against three defendants: the Illinois Department of Human Services (IDHS), Carol Adams, the secretary of IDHS, and Cindy Flamm, the administrator of Choate. (Doc. 2). In his complaint, Jackson raised five claims: sex discrimination in violation of Title VII (Count 1), a violation of the American with Disabilities Act (ADA) (Count 2), violations of his First Amendment rights (Counts 3 & 4), and retaliatory discharge (Count 5). On December 18, 2008, however, Jackson voluntarily moved to dismiss the claims against Defendants Adams and Flamm (Counts 3 & 4), leaving IDHS as the sole remaining defendant in this action.

On March 20, 2009, this Court granted summary judgment in favor of IDHS as to all remaining claims (Doc. 35). In doing so, the Court found that Jackson failed to meet his burden in establishing a *prima facie* case for sex discrimination. Additionally, the Court found that Jackson

1

had abandoned his ADA and retaliatory discharge claims, a ruling which Jackson does not now dispute.

On April 3, 2009, Jackson filed a motion to reconsider and amend the judgment under **FEDERAL RULE OF CIVIL PROCEDURE 59(e)** (Doc. 37). IDHS filed its response on April 17, 2009 (Doc. 39). Having fully reviewed the parties' filings, the Court hereby **DENIES** Jackson's motion.

### B. Legal Standards

The Federal Rules of Civil Procedure do not specifically address motions to "reconsider." However, **Rule 59(e)** permits the filing of motions to alter or amend judgments "no later than 10 days after the entry of the judgment," and **Rule 60(b)** authorizes motions for relief from final judgments or orders.

For many years, the Seventh Circuit (and this Court) used a bright-line test to determine whether **Rule 59(e)** or **Rule 60(b)** governed motions to reconsider. If the motion was filed within ten days of the date the challenged judgment or order was entered, **Rule 59(e)** applied. If the motion to reconsider was filed more than ten days after the judgment or order was entered, then **Rule 60(b)** applied, no matter how the motion was labeled. *See Romo v. Gulf Stream Coach, Inc.*, **250 F.3d 1119, 1121 n.3 (7th Cir. 2001)**; *Britton v. Swift Transp. Co., Inc.*, **127 F.3d 616, 618 (7th Cir. 1997)**; *Russell v. Delco Remy Div. of General Motors Corp.*, **51 F.3d 746, 750 (7th Cir. 1995)**; *Hope v. United States*, **43 F.3d 1140, 1143 (7th Cir. 1994)**; *United States v. Deutsch*, **981 F.2d 299, 301 (7th Cir. 1992)**; *Charles v. Daley*, **799 F.2d 343, 347 (7th Cir. 1986) ("all substantive motions served within 10 days of the entry of judgment will be treated as based on Rule 59").**

In 2008, the Seventh Circuit encouraged a different approach as to motions filed

2

within the ten-day period:

> whether a motion filed within 10 days of the entry of judgment should be analyzed under Rule 59(e) or Rule 60(b) depends on the *substance* of the motion, not on the timing or label affixed to it. Therefore, the former approach—that, no matter what their substance, all post-judgment motions filed within 10 days of judgment would be construed as Rule 59(e) motions—no longer applies. In short, motions are to be analyzed according to their terms . . . .
> Neither the timing of the motion, nor its label (especially when drafted by a pro se litigant) is dispositive with respect to the appropriate characterization of the motion.

***Obriecht v. Raemisch***, 517 F.3d 489, 493 (7th Cir.), *cert.* denied, 129 S. Ct. 417 (2008) (citing ***Borrero v. City of Chicago***, 456 F.3d 698, 701-02 (7th Cir. 2006)). *Borrero* and its progeny have broadened the approach to motions filed within the ten-day period following entry of judgment.

Jackson's motion was filed within the ten-day period.[1] Additionally, the substance of the motion indicates that it falls under **Rule 59(e)**. Jackson's motion seeks to correct what he feels to be the Court's "manifest errors both in apprehending all of the relevant facts and consideration of all of the applicable law" (Doc. 37, p. 2). Based on the timing of filing and its substance, Jackson's motion shall be analyzed under **FEDERAL RULE OF CIVIL PROCEDURE 59(e)**.

---

[1] With respect to the timing issue, the Court notes that the circumstances surrounding the filing of Jackson's motion are peculiar and present a cautionary tale. On the docket sheet, the CM/ECF system suggests that the motion was not entered into the system until April 4, 2009. If that date controlled here, Jackson's motion would have been filed eleven days after entry of summary judgment, which would require the Court to analyze its contents under Rule 60(b). However, the left column on the docket sheet indicates that the motion was filed on April 3, 2009. The same date also appears on the document stamp at the top of the motion itself.

Further inquiry reveals that the motion was entered into the system at midnight on April 4, 2009. But because Jackson's counsel clicked the link to submit the motion before midnight, the motion is regarded as having been filed on April 3, 2009. Jackson receives the benefit of the filing date as recorded by the system. However, this should serve as a reminder to counsel that last-minute filing is a precarious practice, as a further delay of mere seconds would have converted the document from a Rule 59(e) motion to a Rule 60(b) motion.

Four grounds justify reconsideration under Rule 59(e): (1) an intervening change in the law, (2) new evidence not available at the time of the original ruling, (3) a clear legal error, and (4) the prevention of manifest injustice. *See* **Baicker-McKee, Janssen, & Corr, FEDERAL CIVIL RULES HANDBOOK, p. 1006 (2007);** *see also* ***Publishers Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (explaining that Rule 59(e) motions serve a limited function: "to correct manifest errors of law or fact or to present newly discovered evidence.").**

Additionally, in ruling on the instant motion, the Court is mindful that motions to reconsider may not be used to relitigate issues or present arguments which could have been previously addressed. ***Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.");** ***Bally Export Corp. v. Balicar Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986) (explaining that a motion to reconsider is not an appropriate vehicle to introduce new legal theories);** ***Publishers Resource v. Walker-Davis Publications*, 762 F.2d 557, 561 (7th Cir. 1985) (stating that a motion to reconsider should not serve as vehicle "to tender new legal theories for the first time").**

### C. Analysis

#### 1. The Number of Phone Calls Between Jackson and T.L.

First, Jackson claims that this Court erred in stating: "Review of T.L.'s cell phone records . . . showed that at least 198 calls were made between T.L. and Jackson during the relevant period" (Doc. 35, p. 2). Jackson correctly notes that the OIG investigative report is more precise

4

and indicates that the calls were between Jackson and the cell phone of T.L.'s mother (Doc. 24, Exh. H1, OIG Investigative Report 3007-023). Further, Jackson argues that some of the calls did not result in a conversation, and others involved conversations with T.L.'s mother.

But any factual inaccuracy in the Court's statement is inconsequential and does not effect the outcome of the motion. It simply elucidates that fact that Jackson lied to investigators when he told them that he had no contact with T.L. after her discharge. Jackson himself does not deny that he lied, nor does he deny that a portion of these phone calls were made for the purpose of speaking with T.L. In short, the number of phone calls was included merely as background to help explain the basis of the investigator's findings, and to confirm that Jackson did in fact lie. Accordingly, this is not a basis to vacate the Court's prior order.

**2. Whether Jackson's Female Comparators Were Similarly Situated and the Burden of Proof**

Second, Jackson claims that this Court erred in finding that his female comparators were not similarly situated with respect to their conduct. Specifically, Jackson claims that Beth Schlenker and Pat Smith also lied to investigators. He points to statements in an OIG report that he claims serve as indicia of false statements. First, the report notes that "Ms. Schlenker stated the discussion of allowing the Recipients to consume alcoholic beverages was a joke and not seriously considered. This statement is unlikely as Ms. Schlenker signed off on the Supervised Off-Campus Experience form . . . . In addition, Ms. Schlenker posed no objection while on the River Boat to the recipients drinking alcoholic beverages" (Doc. 31, Exh. O, p. 1105).

However, there was no finding on the part of the OIG investigator that either woman obstructed an OIG investigation. The reason is apparent. Schlenker and Smith cooperated with the investigation, did not deny that they had gambled, and did not deny that the patients consumed

5

alcohol (Doc. 31, Exh. O, pp. 1098-99). While the decision to take the patients off campus might have begun with "what ifs," neither woman appears to have attempted to cover her tracks and obstruct the investigation (Doc. 31, Exh. O, pp. 1098-99). This is in direct contrast to the findings made in Jackson's case. Jackson lied to investigators about his relationship with T.L.—the very subject of the investigation—and does not deny this fact. Jackson was fired, in part, for this specific conduct. Therefore, as thoroughly explained in the Court's previous Order, Jackson did not satisfy his burden of identifying a similarly situated female employee with respect to conduct.

Jackson also challenges this Court's finding that he failed to produce sufficient evidence that he and his female comparators were employed in sufficiently similar positions. Jackson was a Mental Health Program Tech III and argues that both Bradshaw and Schlenker are similarly situated because they were employed as Mental Health Tech IIIs. Whatever Schlenker and Bradshaw's positions were, Jackson failed to make it clear to this Court what each job entailed and how they were similar to his. It is not apparent from the record how the responsibilities of Jackson's job as a Mental Health Program Tech III are substantially similar to a Mental Health Tech III, aside from the fact that the titles sound alike.

Jackson also complaints that the Court identified Schlenker as a supervisor. In an effort to bolster the argument that she is a similarly situated comparator, Jackson now offers Schlenker's deposition to show that she did not, in fact, have supervisory duties (Doc. 37, Exh. W, p. 7). But this deposition was not submitted as an exhibit to Jackson's summary judgment motion, and the Court will not now consider evidence that could have been presented earlier. However, the Court did consider the fact that, in its statement of undisputed material facts, IDHS stated: "Beth Slinker (sic), while a supervisor . . . took Choate patients to the Metropolis riverboat casino" (Doc.

24-2, ¶ 55). In response, Jackson stated: "Plaintiff does not dispute these facts" (Doc. 31, ¶¶ 48-55). In doing so, both parties identified Schlenker as a supervisor. And in describing the position, Jackson stated that a Mental Health Tech III supervises the staff and makes "sure that the floors run properly and all the paperwork is done" (Doc. 24-3, Exh. A, p. 13). That is in direct contrast to his description of a Mental Health Program Tech III, which he stated does not involve supervisor duties. As the record indicated that Schlenker worked in a supervisory capacity at the time of the disciplinary action against her, and Jackson did not, the Court sees no reason to revisit the issue.

Additionally, Jackson now argues that Cheryl Bradshaw is similarly situated with respect to her position, because she was a Mental Health Tech II, and "even Defendant admits that a Mental Health Tech II and a Mental Health Tech III have 'basically the same' job duties." But the similarities between these two positions are irrelevant, since Jackson was a Mental Health Program Tech III, and, as explained above, the record indicates there are differences between these positions, including that a Mental Health Tech III has supervisor responsibilities.

In short, the Court found that Jackson failed to meet his burden of establishing any female comparables who were similar with respect to their conduct, performance, or employment responsibilities. Jackson claims that in doing so, the Court held him to a higher standard than required. He notes that he does not have to identify an employee in the identical position who committed the exact same infraction. Jackson is correct that "an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." ***Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000).**

In fact, the Court did not require that Jackson show complete identity, but rather found that, because of the lack of sufficient evidence in the record, he did not show "that his position

7

was similar to those of other employees as to performance or qualifications" (Doc. 35, p. 7). The Court's focus, and the basis of its ruling with respect to the similarly situated prong, was Jackson's failure to meet his burden. It may very well be that one of the employees identified by Jackson is in fact similarly situated. But if so, Jackson did not produce sufficient evidence to establish it. The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).** Importantly, the burden is on the non-moving party to produce specific facts that show a genuine issue for trial. **FED.R.CIV.P. 56(e);** *Moore v. J.B. Hunt Transport, Inc.*, **221 F.3d 944, 950 (7th Cir. 2000).** Jackson failed to meet this burden.

### 3.  Standard Governing Reverse Discrimination Cases

Jackson also argues that the Court erred in holding him to the higher burden generally employed in reverse discrimination cases. In its prior Order, the Court explained:

> In reverse sex discrimination cases . . . a male plaintiff has an even heavier burden, since it is unusual for an employer to discriminate against an employee who is a member of the majority. ***Gore v. Indiana Univ.*, 416 F.3d 590, 592 (7th Cir. 2005);** *Katerinos v. U.S. Dep't of Treasury*, **368 F.3d 733, 736 (7th Cir. 2004)**. Instead of simply showing that he is male, a plaintiff must demonstrate that the employer has a "'reason or inclination to discriminate invidiously against [men]' or evidence that 'there is something "fishy" about the facts at hand.'" *Phelan v. City of Chicago*, **347 F.3d 679, 684 (7th Cir. 2003) (quoting** *Mills v. Healthcare Serv. Corp.*, **171 F.3d 450, 455 (1999)).**

Jackson claims that he should not be held to this higher standard because the workforce at Choate is 62% female. Thus, he claims that he is not a member of the "majority" within his workplace, the Court should not consider his claims under the same rubric as other reverse sex discrimination cases.

8

This argument fails for a variety of reasons. First, Jackson has not provided any case law indicating that his discrimination claim ceases to be "reverse discrimination" simply because his workplace employed more women than men. All indications from this Circuit's precedent suggest that this higher threshold applies in reverse discrimination cases (i.e., where the plaintiff is a member of a historically favored group). *See Mills*, **171 F.3d at 457.** In this case, that means a male employee who alleges sex discrimination must satisfy this heavier burden.

Of course, *Mills* explained that certain background circumstances can support an inference that a defendant discriminates against the majority. There, the Seventh Circuit found that the plaintiff had satisfied his *prima facie* case by establishing that "[b]etween 1988-1995, nearly all promotions at the office went to women, and at the time the challenged hiring decision was made, females dominated the supervisory positions at the relevant office." *Id.* **at 457.** Additionally, *Mills* approvingly referenced ***Reynolds v. School Dist. No. 1, Denver, Colorado***, a Tenth Circuit reverse race discrimination case. **69 F.3d 1523 (10th Cir. 1995).** There, the plaintiff was able to establish sufficient background circumstances because she "was the only white employee in the otherwise all-Hispanic Bilingual/ESOL Department, and Hispanic supervisors made most of the employment decisions." *Id.* **at 1534.**

Jackson does not make this argument, instead opting to take the more extreme view that the typical reverse discrimination case law does not apply at all. But even if he had argued that the situation at Choate involved sufficient background circumstances to establish this prong of his *prima facie* case, the facts presented are not nearly as compelling as those in *Mills* and *Reynolds*. Without more, the mere fact that 62% of the employees at Choate were female does not provide sufficient background circumstances to suggest reverse discrimination.

9

Additionally, at the summary judgment stage, Jackson conceded that the heavier burden employed in reverse discrimination cases applies here. In responding to the IDHS's motion for summary judgment, he stated, "Defendant is also correct that in the context of sex discrimination claims made by males, Plaintiff must satisfy the higher threshold described in *Katerinos* . . . ." (Doc. 31, p. 10). The Court need not reconsider this aspect of its ruling simply because Jackson now wishes to head in the opposite direction in the hopes that a different approach will yield favorable results. And even if Jackson had made this argument at the summary judgment stage, he failed, at that time, to produce any evidence that women outnumber men at Choate. Only now does he offer an excerpt from IDHS's interrogatories to support his new position (Doc. 37-2, Exh. V). His failure to present this information to the Court in the first instance, however, dooms the argument. For as noted above, motions to reconsider may not be used to relitigate issues or present arguments which could have been previously addressed.

**4. Whether Tweedy's Investigation was a "Sham"**

Finally, Jackson claims that he provided enough evidence to support his accusation that Jeff Tweedy's OIG investigation was a "sham." The Court considered this argument in determining whether Jackson had in fact established that IDHS had any reason or inclination to discriminate against men, or that there was anything "fishy" about the circumstances surrounding his termination. The Court explained:

> It is undisputed that Tweedy spoke with everyone involved, and Jackson himself admits that Tweedy was correct in finding that he lied during the course of the investigation (Doc. 24, Exh. G, Tweedy Depo. at 15-28). Such conduct, as well as that of kissing a patient, was in clear violation of the rules governing employee conduct (Doc. 31, Exh. T, Employee Handbook at 2, 3, & 7). In short, Jackson provides nothing other than his own disagreement with the investigator's findings to support his claim that it was a "sham."

(Doc. 35, p. 8).

Jackson takes issue with the Court's statement that Tweedy spoke with "everyone involved." He argues that Tweedy failed to interview other staff and residents. Jackson further claims that had Tweedy done so, he would have learned that Jackson never had an opportunity to be alone with T.L., so he could not have kissed her. This ignores the fact that Tweedy interviewed T.L., her mother, and Jackson—the only people with first-hand knowledge of the alleged relationship. While it is certainly true that Tweedy could have interviewed every employee and patient who was at the facility at the same time as T.L., it is a stretch to say that this expanded investigation would have cleared Jackson of wrongdoing. The allegations imply that Jackson kissed T.L. in secret, and it is implausible that Jackson's co-workers could have accounted for every moment of his employment.

Jackson also argues that the Court overlooked the fact that Tweedy did not consider that T.L. incorrectly claimed that Jackson had tattoos on both arms. But while T.L. was incorrect about the presence of tattoos on both of Jackson's arms, this does not negate the other findings of the OIG, specifically that T.L. did know personal and private information about Jackson.

Moreover, any potential deficiencies in the thoroughness of the investigation may stem from Jackson's own refusal to fully participate in the investigation. He was unresponsive during the investigation, did not want to answer questions about T.L.'s allegations, and ended the interview (Doc. 24, Exh. H1, OIG Investigative Report 3007-023). Had Jackson fully participated, Tweedy could have investigated any corroborating sources given to him. Under these circumstances, it appears that Tweedy conducted a thorough investigation based on the information available to him.

Finally, the Court notes that Tweedy did not simply take T.L.'s word as to all allegations. In fact, he found that T.L.'s more serious claim of sexual abuse was not credible, and determined that the evidence was insufficient to support that particular allegation. There is nothing in the record, other than Jackson's disagreement with the outcome, that indicates that the investigation was a "sham." Accordingly, Jackson's arguments do not support reconsideration of the summary judgment motion.

### D. Conclusion

The Court is unable to locate any clear legal error or manifest injustice in its Order granting summary judgment (Doc. 35). For the reasons thoroughly explained above, the Court must **DENY** Jackson's motion to reconsider (Doc. 37).

**IT IS SO ORDERED.**

**DATED this 30th day of April 2009.**

s/Michael J. Reagan
**MICHAEL J. REAGAN**
**United States District Judge**